**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RICHARD J. SASSI, II,**

                                        **Plaintiff,**

         **-against-**                                                    **9:16-cv-1450**

**DUTCHESS COUNTY, and**
**WARREN COUNTY,**

                                        **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**


                              **DECISION & ORDER**

**I.      INTRODUCTION**

         Plaintiff Richard J. Sassi, II, commenced this action pursuant to 42 U.S.C. § 1983.

He asserts in the Second Amended Complaint ("SAC") that his Eighth Amendment rights

were violated through deliberate indifference to his serious medical needs while

incarcerated at the Dutchess County and Warren County Jails, that his First Amendment

right to the free exercise of his religion was violated while incarcerated at the Warren

County Jail, and that his Fourth Amendment right to be free from unreasonable searches

was violated while incarcerated at the Warren County Jail.  *See generally* SAC, dkt. # 36.

Defendants each move pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing all

claims against them.  *See* dkt. # 49 (Dutchess County motion); dkt. # 50 (Warren County

motion).  Plaintiff opposes the motions on some claims, and withdraws others.  *See* Dkt. #

59.  Both defendants have filed replies to Plaintiff's opposition.  *See* dkt. # 63 (Dutchess County Reply); dkt. # 64 (Warren County Reply). The Court has determined to decide the motions without oral argument.  For the reasons that follow, both motions are granted in part and denied in part.

## II.    BACKGROUND

### a. Procedural

The Court presumes familiarity with the procedural background of this case.  Suffice it to say that following dismissal of some claims without prejudice and with leave to amend, *see* 10/29/17 Dec. & Ord., dkt. # 35, Plaintiff filed the SAC.  He alleges that his Eighth Amendment rights were violated by Dutchess and Warren Counties because each had policies at their respective jails that provided Plaintiff with Benadryl instead of Zyrtec for his allergies, that failed to provide for weekly allergy injections, that prohibited Plaintiff from keeping his EpiPen in his cell, and that prohibited Plaintiff from using his continuous positive airway pressure (CPAP) machine during the day.  In opposition to the motions for summary judgment, Plaintiff withdraws his Eighth Amendment claims relating to the substitution of Benadryl for Zyrtec, the failure to provide weekly allergy injections, and the refusal to allow Plaintiff to keep his EpiPen in his cell. *See* Dkt. # 59, at 1.  Accordingly, these claims are dismissed.  Thus, the only Eighth Amendment claims remaining are based upon Defendants' refusals to allow Plaintiff to use his CPAP machine during the day.

Plaintiff also brings claims against Warren County asserting: (1) that his First Amendment right to the free exercise of his religion was violated because he was denied access to a Bible for several days, and denied the opportunity to attend Bible discussion

groups; and (2) that his Fourth Amendment right to be free from unreasonable searches was violated because he was subjected to a strip search after completing the classification process.

### b. Factual[1]

Plaintiff was employed as a police officer for the City of Beacon, having been promoted to the rank of Detective Sergeant in January 2013. In the Fall of 2013, he was tried and convicted of falsely reporting an incident and sentenced to a term of imprisonment of 6 months. He began serving his sentence in the Dutchess County Jail ("DCJ") on January 6, 2014. Sassi remained in the DCJ until he was transferred to the Warren County Jail ("WCJ") on January 8, 2014.[2] He remained in the WCJ until January 17, 2014 when he was released on bail pending appeal.[3] Additional facts are set forth below in connection with the discussions pertinent to each Defendant's motion.

## III.    STANDARD OF REVIEW

On a motion for summary judgment the Court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1]Unless indicated otherwise, the following relevant facts are admitted in the parties' Local Rule 7.1(a)(3) Statements of Material Facts ("SOMF"), or are supported by one party and not properly disputed by the other. All facts are set forth in the light most favorable to plaintiff.

[2]Sassi was booked into the DCJ at about 2:30 p.m. on January 6, 2014, placed in his cell at 3:24 p.m., and transported to the WCJ late in the afternoon of January 8, 2014, making his stay at DCJ approximately 50-52 hours long. *See* Sassi Dep., at 67, 97.

[3]Plaintiff's appeal was successful and he was re-tried in January 2016, convicted again, and sentenced to a 60-day term of imprisonment which he served in the Putnam County Jail.

Fed. R. Civ. P. 56(a); *see O'Hara v. National Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. DISCUSSION

### a. Dutchess County

As indicated above, Plaintiff's sole remaining claim against Dutchess County is that his Eighth Amendment rights were violated because the DCJ has a policy that prohibited him from using his CPAP machine when he slept in his cell during the day.[4]

#### 1. Relevant Facts

Sassi was booked into the DCJ at about 2:30 p.m. on January 6, 2014. Upon admission, he underwent an intake assessment and physical exam performed by Tiffany McKenzie, a registered nurse.[5] Sassi advised Ms. McKenzie that he had asthma, environmental allergies, and sleep apnea.[6] Sassi told Ms. McKenzie, *inter alia*, that he used his CPAP machine while sleeping. Sassi testified that he may have told Ms. McKenzie that he used the CPAP machine when he napped, although he does not recall whether he

---

[4]There is no dispute that Dutchess County's policy allowed Plaintiff to use his CPAP machine during normal overnight sleeping hours.

[5]Ms. McKenzie was employed by Correctional Medical Care, Inc. ("CMC"), a medical services corporation with which Dutchess County had a contract for CMC personnel to perform all in-facility nursing and physician services for inmates, as well as prescribing and dispensing medication to them.

[6]Sassi had been diagnosed with moderate obstructive sleep apnea, and used a CPAP machine to treat his apnea. *See* Gerringer Decl., ¶¶ 3-4.

made this particular statement. Sassi Dep. at 59.

As part of the intake and medical assessment, Ms. McKenzie spoke with a CMC physician, Sassi's pharmacy, and Sassi's wife with respect to his prescriptions. Sassi's pharmacy indicated that Sassi was to use the CPAP machine every hour of sleep. Possner Decl., Ex. D, at 39, McKenzie Dep. at 41. After consultation with a CMC physician, Ms. McKenzie issued Sassi a Medical Appliance Pass indicting that he could use the CPAP machine during hours of sleep. Ex. D, at 41. The CMC physician's order reflects that Sassi was permitted to keep his Proventil inhaler, use the CPAP machine every hour of sleep, and that he was prescribed a nasal spray and his maintenance inhaler - both of which he got twice daily. *Id.*, at 45.

When Sassi was initially classified on January 6, 2014, he requested and received assignment to protective custody status due to his work as a police officer in Dutchess County. He was placed in Housing Unit 6, which is a special housing unit for inmates who need to be separated from the general population. During Sassi's incarceration in the DCJ, there were 4 other inmates in Housing Unit 6, which has 6 cells. Housing Unit 6 has a common or recreation area adjacent to its cells, and inmates are permitted an hour and a half of recreation each day. Inmates are allowed to spend approximately 2 hours a day outside their cell during which they can engage in recreational activities, take showers, and make telephone calls. Inmates in special housing also move through the housing unit whenever they need to go to another part of the jail - for instance for lawyer or personal visits or trips to see medical personnel. Sassi asserts that he was in his cell 22-23 hours each day and "often fell asleep" during the day. *See* Sassi Decl. ¶ 8.

Sassi was also initially placed on constant supervision pending a mental health

evaluation based upon his responses on a suicide screening form. During constant supervision, a Corrections Officer ("CO") remained seated a few feet from Sassi's cell door at a table with a radio, and made notes every 15 minutes of Sassi's conduct. Sassi remained under close supervision until approximately 12:30 p.m. on January 8 after a visit with a CMC psychiatrist. After close supervision ended, Sassi remained in the same cell until he was transferred to Warren County later in the day on January 8. After close supervision ended, no CO was seated directly outside Sassi's cell, although a CO was stationed close by in the same unit.

The policy of the DCJ is to provide inmates with a prescribed CPAP machine during the normal overnight sleep hours. Consistent with this policy, Sassi was permitted to sleep with his CPAP machine at night, with the CPAP machine brought into Sassi's cell at night and removed in the morning.[7] It was powered through an extension cord that ran from an outlet in a common room adjacent to the special housing unit cells.[8] The DCJ Jail Administrator, Colonel Michael Walters, indicates:

> The CPAP machine is not available for use during the day because powering it via an extension cord presents both a security and a tripping hazard. Furthermore, there was no indication that it was medically necessary that Mr. Sassi have his CPAP machine during the day. If such a medical necessity was known to exist for Mr. Sassi arrangements would have been made to permit it. For instance, he could have been housed in what we call the "shelter housing unit" which is connected to the main medical department on the first floor and utilized for inmates with special medical needs.

Walters Aff. ¶ 12.

---

[7]On January 6, 2014, the CPAP machine was brought to Sassi's cell at 10:12 p.m. On January 7, 2014, the CPAP machine was removed from Sassi's cell at 9:15 a.m. and returned to his cell at 10:20 p.m.

[8]There are no electrical outlets in the cells in Housing Unit 6.

6

The constant supervision log reflects that Sassi slept through the night on January 6 and on January 7, 2014, and Sassi admits that he got a full night's sleep on these two nights. Defendant Dutchess County notes that Sassi's physician has stated to a prospective employer that Sassi does not experience daytime somnolence if he gets a good night's sleep using his CPAP machine. But Sassi asserts that he was unable to keep himself awake during the day while at DCJ, and that he often fell asleep. He contends that, based on log book entries indicating either that he was asleep or resting on his bunk, it is possible that he slept up to three hours and forty-five minutes during the day on January 6, and up to seven and a half hours during the day on January 7. *See* Pl. Counter SOMF, ¶¶ 21-41. Even though there are no log book entries indicating that he was asleep during the day on January 8, there is an entry indicting that Sassi was resting on his bunk for an hour and forty-five minutes. *Id.* ¶ 42-44. Based upon this entry and the fact that constant supervision ended at 12:33 p.m. that day, Sassi contends that "it is very possible" that he "was sleeping for much of [the] time" during the day on January 8. *Id.* ¶ 44.

Sassi contends that he experienced fear and anxiety about falling asleep during the day because of the potential life threatening consequences of sleeping without his CPAP machine. *See* Sassi Decl. ¶ 14. He asserts that he asked DCJ COs to use the CPAP during the day in his cell, but was told he was not allowed to do so because of the policy prohibiting this daytime use. Sassi Dep., at 76, 82; Sassi Decl., ¶ 12. Sassi admits, however, that from time to time he falls asleep at home while watching television without using his CPAP machine. He also admits that at times he forgets to bring his CPAP machine to his current employment as an emergency medical technician ("EMT"), yet, at

these times, sleeps without his CPAP machine while on 24-hour shifts.

CMC nurses made medication rounds to Sassi's cell both in the morning and in the evening. During these rounds he was given Dulera, his maintenance inhaler, and a prescription nasal spray. Sassi told the nurses performing the medication rounds that he had no complaints. While in his cell, Sassi experienced no medical issues that he reported to a CMC nurse or that required him to call on a corrections officer to respond and enter his cell. He does not recall whether he had any conversations with the nurses delivering his medications about the fact that he could not use his CPAP machine during the day. Sassi Dep., at 82-83. There is no dispute that Sassi did not fill out a medical call slip requesting medical care or raising any medical issue while at the DCJ. He does contend, however, that he suffered from sleep apnea the entire time he was confined to DCJ, and asserts that sleep apnea is a medical issue that requires on-going treatment, particularly use of a CPAP machine while he slept. *See* Gerringer Decl., ¶¶ 3-6.

## 2. Eighth Amendment

The Eighth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). Punishment is cruel and unusual if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "'the evolving standards of decency that mark the progress of a maturing society.'" *Id*. at 102 (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Thus, the Eighth Amendment imposes on prison officials the duty to "provide

humane conditions of confinement" for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). However, "[b]ecause the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003).

"To establish an Eighth Amendment violation arising out of inadequate medical treatment, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Estelle*, 429 U.S. at 104). "The deliberate indifference standard is comprised of an objective and a subjective component: (1) the alleged deprivation of medical care 'must be sufficiently serious'; and (2) the defendant must have acted with the requisite mental state, meaning 'something more than mere negligence' and akin to criminal recklessness." *Griffin v. Amatucci*, 611 F. App'x 732, 734 (2d Cir. 2015)(quoting and citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted)); *see Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003)("The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." )(citation omitted); *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003)(To state an Eighth Amendment inadequate medical treatment claim, a plaintiff must first allege "that his medical condition is an objectively serious one." Then, he must allege facts supportive of an inference "that the

defendant acted with deliberate indifference to" that medical condition.).

## A. Objective Prong

The inquiry on the objective prong looks to the seriousness of the inmate's underlying medical condition and the need for care for that condition. *Santiago v. Johnson*, No. 9:11-CV-635 LEK/TWD, 2015 WL 9854844, at *11 (N.D.N.Y. Nov. 16, 2015)*, report and recommendation adopted sub nom. Santiago v. Johnston*, 2016 WL 225695 (N.D.N.Y. Jan. 19, 2016). "The Second Circuit has stated that a medical need is serious if it presents 'a condition of urgency that may result in degeneration or extreme pain.'" *Shabazz v. Howard*, No. 9:12-CV-1372 NAM/TWD, 2015 WL 5604662, at *4 (N.D.N.Y. Sept. 23, 2015)(quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998)).

> [A]n Eighth Amendment claim may [also] be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and . . . actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation. *See Helling v. McKinney*, 509 U.S. 25, 35, 113 S. Ct. 2475, 125 L. Ed.2d 22 (1993) (the potential future health risk caused by exposure to second hand smoke may form the basis for relief under the Eighth Amendment); *cf. White v. Napoleon*, 897 F.2d 103, 111 (3rd Cir.1990) (prisoner need not allege that his medical condition worsened in order to state a viable Eighth Amendment claim for denial of medical care). As the Supreme Court recognized in *Helling*, prison officials may not ignore medical conditions that are "very likely to cause serious illness and needless suffering" in the future even if the prisoner has "no serious current symptoms." *Helling*, 509 U.S. at 33, 113 S. Ct. 2475. Yet, although demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm. *Cf.* [*Hudson v. McMillian*, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed.2d 156 (1992)] (while serious injury is not required to bring an Eighth Amendment excessive force claim, "[t]he absence of serious injury is ... [still] relevant to the Eighth Amendment inquiry").

*Smith v. Carpenter*, 316 F.3d 178, 188 (2d Cir. 2003).

Plaintiff has produced sufficient evidence to satisfy the objective prong of his Eighth

Amendment claim against Dutchess County. His treating physician, Dr. Michael Gerringer, attests that Sassi was diagnosed with moderate obstructive sleep apnea, that obstructive sleep apnea is a medical condition that causes a person's airway to periodically close while sleeping, and that the resulting interruptions in the person's breathing while asleep can cause a decrease in blood oxygenation or hypoxia. Gerringer Decl. ¶ 3. Dr. Gerringer further attests that "[w]hile typical symptoms of sleep apnea include frequent awakenings and resulting daytime [somnolence], the interruptions in breathing and episodes of hypoxia can also result in an arrhythmia (*i.e.,* irregular heartbeat) and even death." *Id.* Dr. Gerringer asserts that "as Mr. Sassi has sleep apnea, if untreated he is subject to these risks every time he sleeps." *Id.* As indicated above, Sassi's sleep apnea is treated with a CPAP machine. *Id.* ¶ 4. Dr. Gerringer states that it is his "professional medical opinion, to a reasonable degree of medical certainty, that the deprivation of his CPAP machine during daytime hours put Mr. Sassi at risk of significant harm, including losing oxygen, developing an arrhythmia and dying, if he were to have fallen asleep during the day without access to the device." *Id.* ¶ 6. Moreover, Dr. Russell Fricke, the WCJ facility physician, testified hat the transient interruptions to respiration caused by sleep apnea can cause long-term development of pulmonary hypertension, right heart failure, and even death through progressive cardiac function deterioration. Fricke Dep., at 34-35. He also explained that a CPAP machine is used to treat this condition by preventing obstructions in the airway while breathing. *See Id.* at 35-36.

This evidence, accepted as true for purposes of the instant motion, adequately demonstrates that Dutchess County's conduct in denying Plaintiff use of his CPAP machine

while he slept during the day exposed him to an unreasonable risk of future harm from his sleep apnea even though he did not exhibit contemporaneous symptoms of this potential future harm. *See Helling,* 509 U.S. at 33-35; *Hudson*, 503 U.S. at 7; *Smith*, 316 F.3d at 18; *see also Griffin v. Amatucci*, No. 9:11-CV-1125 (MAD/TWD), 2014 WL 2779305, at *12, 2014 U.S. Dist. LEXIS 83219, at *13-14 (N.D.N.Y. June 19, 2014)(noting that a number of district courts have concluded that sleep apnea may constitute a serious medical need); *Perez v. Semple*, No. 3:18-CV-1697 (JCH), 2018 WL 6435651, at *2 (D. Conn. Dec. 7, 2018)("Perez has stated sufficient factual allegations showing a 'sufficiently serious' deprivation under the Eighth Amendment. He has alleged that he suffers from sleep apnea, a serious medical condition, and that officials at MWCI have not provided him with a CPAP machine to allow him to sleep throughout the night."); *Ross v. Westchester County*, No. 10 Civ. 3937(DLC), 2012 WL 86467, at *5, 2012 U.S. Dist. LEXIS 3502, at *15 (S.D.N.Y. Jan. 11, 2012) (finding that sleep apnea "may be a life-threatening disorder" and, therefore may be a serious medical condition). While Dutchess County has presented a medical opinion indicating that, in light of Sassi's medical history, a CPAP machine was not medically necessary during daytime naps, *see* Irwin, Aff. ¶ 8,[9] and produced evidence indicating that

---

[9]Dr. Irwin asserts:

As ... detailed in the report dated March 5, 2018 concerning the obstructive sleep apnea, Mr. Sassi's diagnostic testing only showed a single episode of mild hypoxia (87% 02 saturation which is not a dangerously low hypoxia) prior to the incarceration. Sudden death or severe medical event do not occur in obstructive sleep apnea in the clinical situation for Mr. Sassi. His sleep apnea, at most, could cause unrestful sleep causing daytime somnolence for which his CPAP was provided: CPAP during naps is not medically necessary as the clinical situation does not develop to produce significant hypoxia in that setting; to produce hypoxia causing unrestful sleep requires several stages of sleep (such as REM sleep) which are not reached in naps. Under the circumstances, it is my opinion within a reasonable degree of medical certainty, CPAP was not medically necessary for Mr. Sassi during the daytime, a serious medical condition did not exist nor would it have a reasonable likelihood of occurring: In short, there was no serious medical need or risk to his health.

(continued...)

Plaintiff sometimes falls asleep at his home without his CPAP machine while watching television, and occasionally sleeps without his CPAP machine while working 24-hour shifts at his EMT job, this evidence goes to the weight of Dr. Gerringer's opinion and to the amount of actual damages, if any, Plaintiff suffered from being denied his CPAP machine during the day while at the DCJ. Furthermore, it is a disputed factual question whether Plaintiff slept long enough during any daytime period while at the DCJ to enter into a stage of sleep that could cause a risk of a serious adverse medical consequences without his CPAP machine. *See* Irwin Aff. ¶ 8.

## B. Subjective Prong

The subjective prong of an Eighth Amendment denial of medical care claim requires a plaintiff to demonstrate "that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness." *Shabazz*, 2015 WL 5604662, at *4 (citing *Wilson v. Seiter*, 501 U.S. 294, 301–03 (1991); *Hathaway*, 37 F.3d at 66); *see also Lawrence v. Evans*, 669 F. App'x 27, 28 (2d Cir. 2016) ("To satisfy the subjective component [of an Eighth Amendment medical-treatment claim], a plaintiff must establish the equivalent of criminal recklessness, *i.e.*, 'that the charged official act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result.'") (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006)). In this regard, a plaintiff "must demonstrate that [the] defendant acted with reckless disregard to a known risk of substantial harm." *Shabazz*, 2015 WL 5604662, at *4 (citing *Farmer*, 511 U.S. at 836). To establish deliberate indifference, Plaintiff must prove that (1) Dutchess County officials were aware of

---

[9](...continued)
Irwin Aff., ¶ 8.

facts from which the inference could be drawn that Plaintiff had a serious medical need to use his CPAP machine when he slept during the day; and (2) the Dutchess County officials actually drew that inference. *Id.* (citing *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702). "The inmate then must establish that the [defendant] consciously and intentionally disregarded or ignored that serious medical need." *Id.* (citing *Farmer*, 511 U.S. at 835). "[D]eliberate indifference is more substantial than mere disagreement over a course of treatment, negligence or even medical malpractice." *Santana v. Watson*, No. 13 Civ. 1549(SAS), 2014 WL 1803308, at * 5, 2014 U.S. Dist. LEXIS 62628, at * 24 (S.D.N.Y. May 6, 2014) (dismissing claim on summary judgment where, "[a]t most, the[ ] facts show that [the nurse] knew [plaintiff] had a prescription for a CPAP machine and failed to follow up on his CPAP request in a timely manner," but "[t]here [was] no indication that she deliberately denied access ..., or that she knew that the failure to provide a CPAP machine posed an excessive risk to [plaintiff's] health or safety.").

Assuming Plaintiff had a serious medical need to use his CPAP machine when he slept during the day, the subjective analysis of the Eighth Amendment test rests on whether Dutchess County acted with a culpable state of mind. Drawing reasonable inferences in Plaintiff's favor, he barely satisfies this requirement. In light of the potential harmful effects of sleeping without a CPAP machine (*i.e.*, developing a heart arrhythmia and possibly dying), combined with the facts that (1) Plaintiff was given a DCJ physician's order allowing the use of the CPAP machine during hours of sleep, (2) Plaintiff was in his cell for lengthy periods of time during which he was observed sleeping during the day, and (3) Plaintiff asked DCJ COs to use his CPAP machine during the day but these requests were denied

14

because of a DCJ policy allowing only nighttime CPAP machine use, a reasonable factfinder could conclude that Dutchess County officials acted with deliberate indifference to the risks Plaintiff faced by sleeping during the day without his CPAP machine. Because DCJ COs purportedly denied Plaintiff daytime use of his CPAP machine based on a DCJ policy, there is a sufficient basis to hold Dutchess County liable under this claim. *See Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)(Under *Monell v. Dep't of Soc. Serv. of New York*, 436 U.S. 658, 690 (1978), "a prerequisite to municipal liability" is for the Plaintiff to "show that the challenged acts were performed pursuant to a municipal policy or custom."). While Dutchess County may have had legitimate security and safety concerns arising from daytime use of a CPAC machine because of the need to run an extension cord through a common area, this does not override Sassi's right to receive adequate medical treatment. This is especially so where, as at the DCJ, alternative arrangements could have been made to accommodate secure and safe day-time CPAP use. *See* Walters Aff., ¶ 12. It may also be that Plaintiff only took short naps during his time at the DCJ, and that the CMC physician who authorized use of the CPAP machine for hours of sleep did not intend this authorization to include daytime naps, but those are factual issues that cannot be resolved on this motion. Accordingly, Dutchess County's motion to dismiss Plaintiff's Eighth Amendment claim is denied.

**b. Warren County**

As indicated above, Plaintiff brings three claims against Warren County: (1) that his Eighth Amendment rights were violated because he was prevented from using his CPAP

machine during the day;[10] (2) that his First Amendment right to the free exercise of religion was violated because he was denied access to a Bible for several days, and was not allowed to attend Bible study groups; and (3) that his Fourth Amendment right to be free from unreasonable searches was violated because he was subjected to a strip search after completing the classification process.

### 1. Relevant Facts

Sassi arrived at WCJ at about 7:30 p.m. on January 8, 2014. *See* Sassi Dep., 134. Upon his admission, Plaintiff requested that he be placed in protective custody because he felt his safety would be in jeopardy if he was with inmates in general population. Pl. Resp. Warren Cty. SOMF ¶ 67. This request was granted, and he remained in "protective custody status" throughout his ten (10) days of incarceration at the WCJ. Plaintiff was also in "classification status" from the time of his admission until the evening of January 9, 2014, when the classification process was completed. Prior to being placed in his cell on January 8, Plaintiff was stripped searched. Sassi Dep., 176-77. His personal Bible was secured by WCJ staff because it has a "Police Officer" insignia and shield on the cover[11] with the words "THE POLICE OFFICERS BIBLE" on the spine, and has a rigid spine potentially made of plastic or metal,[12] *see* dkt. # 59-13, all of which were deemed to present security risks.

---

[10]There is no dispute that Warren County's policy allowed Plaintiff to use his CPAP machine during normal overnight sleeping hours.

[11]Plaintiff testified that it was his father's Bible, and that his father gave it to him as a gift. The origin of this Bible, however, is irrelevant to matters now before the Court.

[12]Plaintiff denies his Bible has a metal rigid spine, and asserts that "to the extent it contains plastic, it is simply the faux-leather plastic that makes up both covers and the spine. Otherwise, the book is simply bound together like a paperback book and contained within the plastic cover. Neither the cover nor the spine of the book is dangerous, and neither could be made into a weapon." Sassi Decl. ¶ 11.

Also on January 8, 2014, Plaintiff went through an initial medical screening and advised the intake nurse, Teresa Vukosa, RN, that he had sleep apnea which he treated with a CPAP machine while sleeping. *See* Sassi Decl. ¶ 15. Sassi's records from DCJ accompanied him to WCJ, including the record indicating that the DCJ's physician prescribed Sassi to use his CPAP machine at every hour of sleep. *See* Maday Aff. ¶ 10. Upon completing her intake screening, Ms. Vukosa spoke to the facility's physician, Dr. Russell Fricke, who gave a telephone order for Sassi to use his CPAP machine. Plaintiff was provided his CPAP machine every night and it was removed every morning. Because his cell did not have an electrical outlet, the machine was powered by an electrical extension cord that ran out of his cell to a power outlet in an adjacent common room. Sassi asserts that "[l]ike in DCJ, I was permitted to use my CPAP machine at WCJ only during the night and was disallowed from having it or using it at all during the day." Sassi Decl. ¶ 15. Plaintiff contends that he asked an unidentified WCJ CO why he could not keep his CPAP machine in his cell, and was "told it was a policy." Sassi Dep. at 175. Plaintiff also asserts that he made a written medical request "to see if he could keep the CPAP machine during the daytime." *Id.,* at 209. However, he also admits that he "never submitted a medical request form while incarcerated at the WCJ." Pl. Resp. to Warren Cty. SOMF ¶ 26.[13]

Plaintiff was placed in cell number 5 of the Linear A housing unit at 11:08 p.m. on January 8, 2014. Maday Aff., ¶ 4. Linear A is located between the administrative area and the housing units "so the hallway alongside Linear A is among the busiest areas of the

---

[13]The reasons for this apparent discrepancy is unclear. Because the Court must drawn reasonable inferences in Plaintiff's favor on this motion, the Court infers that Plaintiff did not believe his written medical request constituted an official "medical request form."

WCJ. Both Linear A and Linear B are supervised by a single CO who is located in the hallway where he/she can observe the 'day areas' (a/k/a common areas) of both Linear units and has easy access to observing all ten cells." Maday Aff. ¶ 6. The day area of Linear A is separated from the hallway by a partial wall and steel fence-like material so that corrections staff can see and hear what is occurring in the day area of Linear A as well as the five cells in Linear A. *Id.* "Accordingly, inmates housed in Linear A, whether they are located in their cell or the day area, can see and communicate with every Corrections staff member who travels along the hallway in front of Linear A, as well as the CO assigned to supervise the two Linear units. During any given eight hour shift, dozens of Corrections staff walk that hallway in front of Linear A, as well as members of the medical staff." *Id.* "In addition, the medical staff working at the WCJ in January 2014 made three regular 'med pass' rounds each day, which included Linear A." *Id.* As indicated above, Plaintiff admits that he never submitted a medical request form while incarcerated at the WCJ. Pl. Resp. to Warren Cty. SOMF ¶ 29.

At the WCJ, an inmate in protective custody status could be housed in either Linear A or B, or any of three housing pods. In Plaintiff's case, since he requested protective custody on the basis of his occupation as a police officer and his fear of how other inmates might react to him, he was not permitted to have any direct contact with any other WCJ inmate so long as he remained in protective custody status. Before admission to the WCJ, Plaintiff understood that protective custody at the WCJ precluded him from having direct contact with other WCJ inmates. Plaintiff never requested to be removed from protective custody status. "In Plaintiff's case, protective custody status was an accommodation of his request to promote his safety, not a punishment. While in protective custody status, Plaintiff

18

[was] permitted to leave his cell for among other things: recreation; visitation; court appearances; medical attention; to access the Linear A day room, library or other inmate services so long as other inmates were not present." Maday Aff., ¶ 7.   Sassi contends that, like at the DCJ, he remained in his cell at the WCJ "about twenty-three hours each day," and "was prone to falling asleep often throughout the day and, in fact, did fall asleep often throughout the day there."  Sassi Decl. ¶ 4.

After Plaintiff completed the classification process on the evening of January 9, 2014, he was told he would be required to submit to a non-contact strip search as a matter of WCJ policy.  *Id.*, ¶ 19; *see* Maday Aff., Ex. H, BATES no. WC000137.[14]   Plaintiff protested this strip search because, he contended, he had not left his cell since being placed there after his initial strip search and therefore saw no reasons for another strip search.  Sassi Dep., 176-77.  The WCJ Jail Administrator, Captain Albert Maday, asserts that the post-classification strip search was

> directly related to the contraband risks associated with [Plaintiff's] change in status. First, the non-contact search[] conducted of inmates who enter the secure portion of the WCJ are not absolutely effective in preventing the introduction of contraband. Inmates are increasingly creative in secreting contraband inside their bodies which contraband is not discharged or discovered until days later.  Second, inmates periodically secret medication, pills and other substances while in jail by "cheeking" their medication or secreting it in other body cavities in order to subsequently sell or misuse such substances. Third, Plaintiff had extensive access to a CPAP machine and electrical cords which afforded him the opportunity to dismantle and/or misuse such items for illegitimate purposes at a later date. Finally, because Plaintiff's protective custody status was initiated by Plaintiff, it could have been changed at any time and thus once the classification procedure was  completed as of January 9, 2014, Plaintiff was eligible to be transferred to multiple other locations within the WCJ and potentially have contact with inmates in the general population.

---

[14]WCJ Policy No. 306 provides in pertinent part that a strip search may be conducted "[j]ust prior to being released from classification status and receiving a permanent housing unit assignment to ensure the absence of contraband and weapons."

> Accordingly, because Plaintiff's protective custody status could have been changed at any time, the completion of the classification process rendered Plaintiff eligible for movement within the WCJ and potential contact with other inmates and those circumstances warranted a confirmatory visual non-contact search.

Maday Aff. ¶ 19. Plaintiff admits that there was no physical contact during this strip search, and that it was conducted in a respectful manner.

After Plaintiff's Bible was secured and he was placed in his cell, he repeatedly requested that he be provided a Bible by WCJ staff. These requests were denied because Plaintiff was not indigent, and was informed that he could purchase a Bible from the WCJ Commissary. Sassi Dec. ¶ 16. But Sassi was not able to procure items from the Commissary until January 14, 2014, at which time he purchased a new soft bound (without rigid spine material) Bible which he used and kept in his cell.

Sassi also repeatedly requested to participate in Bible discussion groups at the WCJ but was told that, since he was in protective custody, he was not permitted to participate in those groups. Sassi Decl., ¶ 15. The WCJ written Religious Services policy provides: "Inmates confined in Administrative or Disciplinary Segregation are prohibited from attending any group Bible Study Program to prevent their commingling with other inmates. These inmates shall be afforded access to religious services directly from the service provider, following the approval of the Tour Supervisor, during times that do not conflict with Facility operations." Johnson Decl., Ex. 4, Bates No. WC000132; *see also* Maday Dep. at 41-43. Captain Maday asserts that during the ten days Plaintiff was incarcerated at the WCJ, private outside groups that facilitate religious activities such as Bible study groups with inmates entered the WCJ on three different dated but never visited Linear A where Plaintiff was housed. Maday Aff., ¶ 13. He further asserts that "[h]ad Plaintiff not requested

to be placed in protective custody status, he would have had the opportunity to participate in Bible study when inmates housed in Housing Pod 'B' did so - but no such group study was held [in Linear A] by the volunteer groups while Plaintiff was incarcerated at the WCJ." *Id.* Sassi contends that he was "never told that the reason [he] could not participate is because the outside groups who came to the jail to conduct the program would not be coming to my area of the jail." Sassi Decl., ¶ 15. However, he admits that "[o]n January 15, 2014, [he] was informed in writing that if he was released from protective custody, he would be able to attend bible study." Pl. Resp. Warren Cty. SOMF ¶ 68. There is no dispute that during Plaintiff's incarceration at the WCJ, he made no arrangements or requests to have family members or members of his parish visit him for the purposes of engaging in any religious or worship activities.[15]

### 2. Eighth Amendment Claim

For the reasons discussed above with regard to Plaintiff's Eighth Amendment claim against Dutchess County, Plaintiff satisfies the objective element of his Eighth Amendment claim against Warren County. Further, because Plaintiff alleges that he regularly slept during the day while at the WCJ, asked WCJ COs for daytime use of his CPAP machine, made a written medical request to keep his CPAP machine in his cell during the day, and the WCJ physician gave an order for Plaintiff to use his CPAP machine, Sassi presents sufficient evidence from which a reasonable factfinder could conclude that Warren County was deliberately indifferent to Plaintiff's medical need for daytime use of the CPAP

---

[15]Plaintiff asserts that he asked WCJ Corrections Officers "if the priest could come around with Communion," but "[t]hey said no." Sassi Dep. at 174. Plaintiff does not present a First Amendment claim based on the denial of Communion or participation in any other religious activities.

machine. In this regard, a reasonable factfinder could conclude that Plaintiff's asserted requests for daytime use of his CPAP machine were sufficient to put WCJ medical personal on notice of his desire for this use, or should have triggered further investigation into whether daytime CPAP use was necessary. These factual issues cannot be resolved on this motion. Thus, Warren County's motion on this ground is denied.

### 2. First Amendment Claims

Plaintiff also asserts that his First Amendment right to the free exercise of religion was violated because (1) he was denied access to a Bible for several days, and (2) he was not allowed to attend Bible study groups. "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). "The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but is instead subject to valid penological concerns, including those relating to institutional security." *Jackson v. Boucaud*, No. 9:08-CV-1373 (TJM/DEP), 2009 WL 6066799, at *5 (N.D.N.Y. Dec. 31, 2009), *report and recommendation adopted*, 2010 WL 933744 (N.D.N.Y. Mar. 15, 2010) (citing *O'Lone v. Estate of Shabazz*, 483 U.S. 342, 328 (1987); *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir.1993)); *see also Gilliam v. Baez*, No. 15-CV-6631 (KMK), 2017 WL 476733, at *4 (S.D.N.Y. Feb. 2, 2017)("A prisoner's First Amendment rights, however, are '[b]alanced against ... the interests of prison officials charged with complex duties arising from the administration of the penal system.' Accordingly, a prisoner's free exercise claims are 'judged under a reasonableness test less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights.'")(quoting

22

*Ford*, 352 F.3d at 588).

Examination of Plaintiff's Free Exercise claims entails application of a three-part, burden shifting framework. *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir.1988); *Jackson*, 2009 WL 6066799, at *5. Plaintiff bears the initial burden of establishing that the disputed conduct substantially burdens his sincerely-held religious beliefs. *See Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006)(A prisoner "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.") (citing *Ford*, 352 F.3d at 591); *Hammock v. Pierce*, No. 15-CV-09052 (NSR), 2018 WL 2108244, at *4 (S.D.N.Y. May 7, 2018)("To establish a Free Exercise claim, an inmate plaintiff must typically make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs.")(interior quotation marks, footnote and citations omitted); *see also Barnes v. Furman*, 629 Fed. App'x 52, 55 (2d Cir. 2015)("To prevail on a First Amendment claim, a plaintiff must show that he has a sincerely held religious belief, that it was substantially burdened, and that defendants' conduct was not reasonably related to some legitimate penological interest.").[16] Plaintiff's burden in demonstrating substantial burden "is not a particularly onerous task." *Rossi v. Fishcer*, No. 13-CV-3167 (PKC) (DF),

---

[16]"[T]he Second Circuit has yet to decide whether the 'substantial burden' test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S. 872, 887 (1990), in which the Court suggested that application of the test 'puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.'" *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 280 n. 10 (N.D.N.Y. 2018)(quoting *Ford*, 352 F.3d at 592 (in turn quoting *Emp't Div.*, 494 U.S. at 887)); *see also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. May 6, 2016) ("We have not yet decided whether a prisoner asserting a free-exercise claim must, as a threshold requirement, show that the disputed conduct substantially burdened his sincerely held religious beliefs."); *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). Despite this uncertainty which was referenced in the 10/20/17 Decision and Order, dkt. # 35, at 11, both Plaintiff and Warren County proceed under the assumption that the "substantial burden" test applies. *See* Pl. Mem. L., at 18-26; Warren Cty. Mem. L., at 14-17; Warren Cty. Reply, at 5-8. In light of the parties' arguments, and absent controlling authority to the contrary, the Court applies the "substantial burden" test.

2015 WL769551, at *7 (S.D.N.Y. Feb. 24 2015) (internal quotation marks omitted). "[I]n evaluating this factor the court must be wary of 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds[,]' and instead may only consider whether the particular plaintiff holds a belief which is religious in nature." *Jackson*, 2009 WL 6066799, at *5 (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 201 (2d Cir. 2004) (in turn quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989), and citing *Ford*, 352 F.3d at 590; *King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar.30, 2007)). "The Court must 'resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith.'" *Brown v. Semple*, No. 3:18-CV-01239 (JAM), 2018 WL 5619195, at *3 (D. Conn. Oct. 30, 2018)(quoting *McEachin*, 357 F.3d at 201). "Instead, the Court must ask whether the state has put 'substantial pressure on an adherent to modify his behavior and violate his beliefs.'" *Id.* (quoting *McEachin*, 357 F.3d at 202 n.4 and noting the uncertainty of the "substantial burden" test after *Emp't Div. v. Smith*).

If Plaintiff makes this showing, the burden shifts to Defendant to identify a legitimate penological purpose justifying the decision under scrutiny. *Salahuddin*, 467 F.3d at 274-75; *Jackson*, 2009 WL 6066799, at *5; *Evans v. Albany County Corr. Facility*, No. 9:05-CV-1400, 2009 WL 1401645, at *6 (N.D.N.Y., May 14, 2009). This is a "relatively limited burden of identifying the legitimate penological interests . . . justifying [the] impinging conduct." *Salahuddin,* 467 at 275.

If Defendant articulates such a penological interest, its reasonableness is then subjected to analysis under the test set out by the Supreme Court in *Turner v. Safley. See*

*Jackson*, 2009 WL 6066799, at *5 (citing *Turner v. Safley*, 482 U.S. 78 (1987)).

> Under *Turner*, the court must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective. The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question. Lastly, the court must examine the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison. Decisions rendered since *Turner* have clarified that when applying this test, a court should examine the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests.

*Id.,* at *6 (internal quotation marks, citations, and alterations omitted). "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.'" *Ford*, 352 F.3d at 595 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir.1989)) (alteration omitted).

Plaintiff asserts that he is, and was at relevant times, a practicing Catholic. Sassi Decl. ¶ 3. He contends that he "takes his religion very seriously," *id.*, maintains that in January 2014 he "read the Holy Bible regularly and enjoyed discussing his religion and the Liturgy with others," and asserts that he considers these activities "to be important and essential components to the faithful practice of his religion." *Id.* ¶ 5. These assertions, accepted as true for purposes of the instant motion, satisfy Plaintiff's burden of demonstrating that Defendant's actions of prohibiting access to a Bible for several days and preventing Plaintiff from attending Bible study groups substantially burdened his sincerely held religious beliefs.[17] *See Morse v. Annucci*, No. 13-CV-1354 (LEK) (DEP), 2015 WL 5725046, at *5 (N.D.N.Y. Sept. 29, 2015) (finding the confiscation of a crucifix used for prayer sufficient to support a free exercise claim); *Dilworth v. Goldberg*, No. 10-CV-2224

---

[17]Warren county does not challenge Plaintiff's claims on this ground.

(JMF), 2014 WL 3798631, at *9 (S.D.N.Y. Aug. 1, 2014) (noting that the confiscation of a Bible can form the basis for a free exercise claim); *Shepherd v. Powers*, No. 11–CV–6860 (LTS), 2012 WL 4477241, at *8 (S.D.N.Y. Sept.27, 2012) (holding that plaintiff stated a free exercise claim where he alleged that he was denied access to his personal Bible and Sunday group worship); *Dilworth v. Goldberg*, No. 10-CV-2224 JMF, 2014 WL 3798631, at *9 (S.D.N.Y. Aug. 1, 2014); *Malik v. City of N.Y.*, No. 11-CV-6062 (PAC)(FM), 2012 WL 3345317, at *12 (S.D.N.Y. Aug 15, 2012) ("[The plaintiff's] allegations that he practices Islam and that [the defendants] ripped up and destroyed his sacred Quran states a legally sufficient claim under [ ] the Free Exercise Clause."), *report and recommendation adopted*, 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012).

Warren County asserts that it had a valid penological purpose justifying the decisions under scrutiny. Plaintiff's Bible was apparently confiscated by WCJ staff upon his admission because it identifies Plaintiff as a police officer, and its spine material could potentially be used as a weapon. Inasmuch as Plaintiff requested placement in protective custody because of his fear of retaliation by other inmates due to his employment as a police officer, WCJ officials had a legitimate penological interest to secure this Bible ostensibly identifying Plaintiff's line of work. Further, the spine of Plaintiff's Bible is made of some rigid material. *See* Dkt. # 59-13.[18] Plaintiff's conclusory allegation that the spine material is not metal or rigid plastic that could be converted to a weapon does not override WCJ official's determination that the Bible posed a security risk. Likewise, the DCJ's Property Officer's determination allowing Plaintiff to have his personal Bible in his cell at the

---

[18]The spine is completely covered by the Bible's cover, thus obscuring the actual material comprising the spine.

DCJ based on that officer's visual assessment of the Bible does not mean, *a fortiori*, that Plaintiff's Bible passed muster under WCJ safety standards. Warren County has articulated a legitimate penological interest in securing Plaintiff's personal Bible.

The governmental objectives underlying confiscation of Plaintiff's Bible - protecting Plaintiff's safety and prohibiting material into the WCJ that could be used as a weapon - are legitimate and neutral, and rationally related to the objectives they seek to promote. However, a reasonable alternative to allowing Plaintiff to retain his personal Bible would be to provide Plaintiff with an acceptable Bible, allow someone to deliver one to him, or allow him to immediately purchase a Bible from the commissary. For whatever reason, none of these alternatives were instituted and Plaintiff was left without a Bible for a number of days. This lapse of Plaintiff's access to a Bible does not automatically amount to a First Amendment violation. Rather, the pertinent question is whether the denial of Plaintiff's request for another Bible (if in fact he made such a request) from the evening of January 8, 2014 until he was able to purchase one on January 14, 2014 constitutes a substantial burden on Plaintiff's religious beliefs. This presents a factual dispute that cannot be resolved on this motion. While Plaintiff attests that in January 2014 he "regularly" read the Bible, it is unclear whether this regularity amounted to daily reading of the Bible, or perhaps more sporadic reading. It will be for a jury to determine whether the period that Plaintiff was denied a Bible amounted to a substantial burden on Plaintiff's religious beliefs. *See Singh v. Goord*, 520 F.Supp.2d 487, 504 (S.D.N.Y.2007) (finding that a genuine dispute of material fact exists for trial with respect to whether the defendants substantially burdened the plaintiff's right to exercise his religion by forbidding him from wearing a Khanda, which is a Sikh religious pendant worn around the neck). Therefore, the motion on this ground is

denied.

Nevertheless, Plaintiff's Free Exercise claim based on his inability to attend Bible study groups must be dismissed.  The facts are undisputed that Bible study groups at the WCJ were administered by outside entities, and that these entities came to specific housing units at the WCJ to conduct these Bible study groups.  It is also undisputed that during the period Plaintiff was incarcerated at the WCJ, none of these Bible study groups were administered in the housing unit where Plaintiff was housed.  Because Plaintiff was placed in protective custody status by his own request in order to avoid contact with the general population, WCJ officials had a legitimate penological interest in restricting Plaintiff's movement to the housing unit in which he was placed.  Defendant's reason for maintaining Plaintiff in his housing unit fulfills the legitimate and neutral objective of protecting Plaintiff's safety and preventing possible disturbances in the WCJ.   Due to the uncontested facts that no outside entities administered Bible study groups in the housing unit where Plaintiff was housed during his incarceration, and that Plaintiff determined not to revoke his protective custody classification to allow attendance with these groups in other areas although advised of this option, there appears to be no adequate alternative means to accommodate Plaintiff's desire to attend Bible study groups. Further, Plaintiff presents no evidence that Warren County had control over the operations of the outside entities that came to the WCJ to administer the Bible study groups.  Thus, it cannot be said that  Warren County was causally responsible for Plaintiff's failure to attend Bible study groups while incarcerated because it did not schedule a Bible study group in Plaintiff's housing unit during his brief incarceration at the WCJ.  Accordingly, Warren County's motion on this ground is granted and the claim dismissed. *See Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir.2013)

("Even if Defendants–Appellees substantially burdened [the Plaintiff–Appellant]'s sincerely held religious believes, their actions do not constitute a constitutional deprivation if they were reasonably related to legitimate penological interests.") (internal quotation marks and citation omitted).

## 2. Fourth Amendment Claim

Plaintiff asserts that his Fourth Amendment right to be free from unreasonable searches was violated because he was subjected to a strip search after going through the classification process. "While inmates do not retain the full range of constitutional rights that unincarcerated individuals enjoy, they do retain 'some Fourth Amendment rights upon commitment to a correctional facility.'" *Allen v. Graham*, No. 9:16-CV-47 (GTS/ATB), 2017 WL 9511168, at *10 (N.D.N.Y. Sept. 26, 2017), *report and recommendation adopted*, 2017 WL 5957742 (N.D.N.Y. Dec. 1, 2017) (quoting *Bell v. Wolfish*, 441 U.S. 520, 558-60 (1979)). This includes a limited right to bodily privacy. *See Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016).[19] For Plaintiff to prevail on this claim, he must establish (1) that he had an actual, subjective expectation of bodily privacy; and (2) that WCJ officials lacked a sufficient justification to intrude on Plaintiff's expectation of bodily privacy. *Harris*, 818 F.3d 49, 57 (2d

---

[19]In *Harris*, the Second Circuit wrote:

While acknowledging that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S. Ct. 3194, 82 L. Ed.2d 393 (1984), we held more than twenty years ago "that maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy," *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir.1992). We are aware of no intervening Supreme Court decision calling that holding into doubt, and we reiterate today that inmates retain a limited right to bodily privacy under the Fourth Amendment.

818 F.3d at 57.

Cir. 2016).

Because Warren County does not challenge Plaintiff's claim on the first issue, the Court proceeds directly to the second. In addressing the second issue, "courts apply one of two separate but overlapping frameworks" depending on whether Plaintiff challenges a regulation or policy, or whether Plaintiff challenges an isolated search. *Id.*, at 57–58 (2d Cir. 2016). Where an inmate's Fourth Amendment claim challenges a regulation or policy, "courts typically analyze the claim under *Turner v. Safley*." *Id.*, at 57. "Under *Turner*, 'the regulation is valid if it is reasonably related to legitimate penological interests.'"" *Id.* at 57-58 (quoting *Turner*, 482 U.S. at 89). In making this determination, the Court applies four factors discussed in *Turner*: (1) whether there is a valid, rational connection between the WCJ regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right in question that remain open to WCJ inmates; (3) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of WCJ resources generally; and (4) whether there are reasonable alternatives available to WCJ authorities. *Turne*r, 482 U.S. at 89–90. The burden is upon the prisoner to show that a challenged regulation is unreasonable. *Covino v. Patrissi*, 967 F.2d 73, 79 (2d Cir. 1992).

"[I]f the inmate's Fourth Amendment claim challenges an isolated search, courts typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed.2d 447 (1979)." *Harris*, 818 F.3d at 58. Under *Bell*, "[t]he test of reasonableness under the Fourth Amendment . . . [i]n each case . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must

consider (1) the scope of the particular intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted." *Bell*, 441 U.S. at 559.

Plaintiff argues that he presents a viable challenge to his post-classification strip search using an "applied challenge to Warren County's strip search policy." Pl. Mem. L. at 28. He contends that he presents sufficient facts to support his claim that his strip search was unreasonable under the *Bell* factors. *Id.* The Court disagrees. On the facts presented, no reasonable factfinder could find in Plaintiff's favor on this claim. There is no dispute that at the end of the classification process Plaintiff was subjected to a non-contact strip search conducted in a respectful manner. Plaintiff presents no facts indicating that he was strip searched in a location or at time that he was observed by other people not involved in the search, or that increased the embarrassment associated with such a search.

Plaintiff's challenge to the justification for the search is also without merit. He asserts that the search was unnecessary because he intended to remain in protective custody, and because, given that the classification process could be completed in a short period or "could sometimes take up to a few days," it is unlikely to have discovered contraband that was ingested before arriving at the WCJ "and excreted . . . sometime between booking and classification." Pl. Mem. L., at 29 (citing Sassi Dep. at 60-61). Plaintiff's argument ignores the fact that, at the time this search was conducted, WCJ officials had no way of knowing if Plaintiff would revoke his protective custody status at some future date. Furthermore, at the time the search was conducted, Plaintiff had had access to his CPAP machine which, as expressed by Captain Maday, could have been dismantled to provide contraband that could

have been secreted in a body fold or cavity. Plaintiff also had access to the CPAP machine's extension cord, and to his allergy medication, all of which could have constituted contraband which could have been secreted on or in Plaintiff's body and provided to general population inmates if Plaintiff revoked his protective custody status. In the end, Plaintiff fails to presents facts upon which a reasonable factfinder could assess liability against Warren County under the *Bell* factors.

Likewise, Plaintiff fails to present facts under which a reasonable factfinder could assess liability against Warren County for the strip search policy under the *Turner* factors. For the reasons expressed above, there existed a valid, rational connection between the WCJ post-classification strip search policy and the legitimate governmental interest of preventing contraband distribution within the WCJ. Furthermore, Plaintiff fails to establish an alternative means for the WCJ to exercise its need to search inmates for hidden contraband, or an accommodation of inmates' limited right to bodily privacy that would not have an unreasonable impact upon guards and other inmates, and upon the allocation of WCJ resources generally.

For these reasons, Plaintiff's Fourth Amendment strip search claim is dismissed.

## V. CONCLUSION

For the reasons set forth above, Dutchess County's motion for summary judgment, dkt. # 49, is **GRANTED IN PART and DENIED IN PART**. The motion is **denied** as to Plaintiff's Eighth Amendment claim concerning the daytime use of a CPAP machine, and is **granted** in all other respects. All claims against Dutchess County other than Plaintiff's Eighth Amendment claim concerning the daytime use of a CPAP machine are **DISMISSED**.

Warren County's motion for summary judgment, dkt. # 50, is **GRANTED IN PART and DENIED IN PART**.  The motion is **denied** as to Plaintiff's Eighth Amendment claim concerning the daytime use of a CPAP machine, and Plaintiff's First Amendment Free Exercise claim concerning access to a Bible from January 8, 2014 to January 14, 2014, and the motion is **granted** in all other respects.   All claims against Warren County other than Plaintiff's Eighth Amendment claim concerning the daytime use of a CPAP machine and his First Amendment Free Exercise claim concerning access to a Bible from January 8, 2014 to January 14, 2014 are **DISMISSED**.

Dated:January 23, 2019

Thomas J. McAvoy
Senior, U.S. District Judge